## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **JOSHUA WILLIAM MORROW, JAMES CLINT THORNTON, CHARLES NARRAMORE, CODY TAYLOR LASHLEY,** | § § § § § § § § § § § | **CIVIL ACTION NO. 6:21-CV-00302-JCB** |
| **Plaintiffs,** | | |
| **v.** | | |
| **JAMES CLAY SHORT, MATTHEW GOOLSBY, MIKE HARRIS, KEITH BEAM, VERNON MITCHELL,** | | |
| **Defendants.** | | |

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

Before the court is Defendants' Keith Beam, Matthew Goolsby, Mike Harris, Vernon Mitchell, and James Clay Short (collectively "Defendants") motion for summary judgment. (Doc. No. 45.) Plaintiffs Cody Taylor Lashley, Joshua William Morrow, Charles Narramore, and James Clint Thornton (collectively "Plaintiffs") have filed a response (Doc. No. 52), to which Defendants have filed a reply (Doc. No. 62). For the reasons stated herein, the court **RECOMMENDS** that Defendants' motion for summary judgment (Doc. No. 45) be **GRANTED**.

## BACKGROUND

Plaintiffs filed the instant action on August 6, 2021, alleging violations of the Eighth Amendment pursuant to 42 U.S.C. § 1983 against Defendants. (Doc. No. 2.)[1]

---

[1] Plaintiffs filed a corrected complaint on August 23, 2021 to fix an error that occurred in the table of contents. (Doc. No. 10.)

## I.    Plaintiffs' Complaint

As alleged, Plaintiffs were, at all relevant times, inmates at the Texas Department of Criminal Justice ("TDJC") Powledge Unit in Palestine, Texas. (Doc. No. 2, at ¶ 12.) Plaintiffs allege that: (1) Defendant James Clay Short ("Defendant Short") was an employee of TDCJ responsible for supervising inmates who worked as an Agricultural Specialist; (2) Defendant Matthew Goolsby ("Defendant Goolsby") was an employee of TDCJ responsible for supervising inmates who worked as an Agricultural Specialist; (3) Defendant Michael Harris ("Defendant Harris") was an employee of TDCJ responsible for supervising inmates who worked as an Agricultural Specialist; (4) Defendant Keith Beam ("Defendant Beam") was an employee of TDCJ responsible for supervising inmates who worked as an Agricultural Specialist; and (5) Defendant Vernon Mitchell ("Defendant Mitchell") was an employee of TDCJ responsible for supervising inmates who worked as Assistant Warden for TDCJ. *Id.* at ¶¶ 13–17.

Specifically, Plaintiffs allege that they were responsible for artificially breeding hogs as well as slaughtering them so they could be processed at the TDCJ Michael Unit in Tennessee Colony and then sent to surrounding prisons for inmates to eat. *Id.* at ¶ 21. Plaintiffs allege that they were responsible for taking care of hogs seven days a week from 5:00 A.M. to 3:00 P.M. and that they were not properly informed of associated health risks. *Id.* at ¶¶ 26–27. Plaintiffs allege that they were told by Defendants Short, Goolsby, and Harris not to concern themselves with the possibility of catching a disease or infection. *Id.* at ¶ 27. Plaintiffs further allege that they were responsible for handling hogs without being trained on how to protect themselves from exposure, without proper protective equipment ("PPE"), and that they were exposed to bodily fluids from the hogs. *Id*. at ¶¶ 28–30. Plaintiffs allege that Defendants Goolsby, Harris, Short, and Beam

instructed Plaintiffs to continue handling hogs after Plaintiffs complained about a potential bodily fluid exposure after a malfunction with the artificial insemination equipment. *Id.* at ¶ 32.

Plaintiffs allege that testing of the hogs began on August 1, 2019, and that on August 16, 2019, five hogs that tested positive from Brucellosis were killed by a veterinarian at the facility. *Id.* at ¶¶ 40, 41. After, all 800 hogs had to be tested, and on September 1, 2019, 120 hogs tested positive for Brucellosis. *Id.* at ¶¶ 44, 45. Plaintiffs allege that the Texas Animal Health Commission directed that the hogs needed to be killed and that the hogs were killed and buried in the vicinity of the prison. *Id.* at ¶¶ 46, 51. Plaintiffs allege that all Defendants handling the hogs were wearing full hazmat suits, but that Plaintiffs were not given them. *Id.* at ¶¶ 49, 50. Plaintiffs allege that Defendant Assistant Warden Mitchell, knowing that the hogs presented a serious risk of harm to the people working with them, did not cease work operations and instructed TDCJ employees to wear PPE, but would not provide that same PPE to Plaintiffs. *Id.* at ¶¶ 52, 53. Plaintiffs allege that Plaintiff Morrow tested positive for Brucellosis on September 13, 2019; Plaintiff Thornton tested positive on October 3, 2019; Plaintiff Lashley tested positive on October 16, 2019; and Plaintiff Narramore displayed signs and symptoms during the same time period. *Id.* at ¶¶ 58–61.

### a. Plaintiff Thornton

Plaintiff Thornton alleges that he worked in the farrowing barn for approximately 13 months and was responsible for artificial inseminations on hogs and delivering piglets. *Id.* at ¶¶ 62, 63. Plaintiff Thornton alleges that he was only given thin gloves to assist with delivery and that he often came into contact with bodily fluids as gloves would rip and at times his hands would bleed. *Id.* at ¶¶ 64–67. Plaintiff Thornton also alleges that the artificial insemination machine would malfunction and the tubes would bust, getting semen all over him. *Id.* at ¶ 68. Plaintiff Thornton alleges that Defendants Harris, Short, and Goolsby all had knowledge of this but failed

to provide adequate PPE. *Id.* at ¶¶ 69, 71. Plaintiff Thornton alleges that he requested to be tested on September 3, 2019 due to potential exposure with infected hogs, but was not evaluated until September 16, 2019. *Id.* at ¶¶ 72, 73. Plaintiff Thornton alleges that he reported not feeling well for three or four weeks with symptoms such as headache, lethargy, and stomach pain. *Id.* at ¶ 74. Plaintiff Thornton alleges that despite knowing that hogs had had positive test results of Brucellosis, by the time he was medically evaluated, he was only discharged and given ibuprofen for pain. *Id.* at ¶ 75. On September 17, 2019, Plaintiff Thornton alleges that he received a follow up appointment with unit physician Irene Oyolu and received antibiotics and a referral to Galveston Infectious Disease Clinic for potential exposure to Brucellosis. *Id.* at ¶ 76, 77. Plaintiff Thornton states that he informed Warden Mitchell about the conditions at the hog barn the following day, but that Warden Mitchell did not cease operations, but instead instructed TDCJ employees to wear PPE and failed to provide that same PPE to the inmates working in the hog barn. *Id.* at ¶¶ 78–81. Plaintiff Thornton alleges that he filed grievances, and on October 3, 2019, he was issued an infirmary pass indicating a positive test result for Brucellosis. *Id.* at ¶¶ 81–85. Plaintiff Thornton alleges that, as a result of contracting swine Brucellosis, he suffered headaches, weight loss, stomach pain, body aches and decreased appetite as well as orange and runny stool. *Id.* at ¶ 87.

### b. Plaintiff Narramore

Plaintiff Narramore alleges that he worked at the farrowing barn for approximately 11 months and his responsibilities included disposing of hogs by burning their bodies in an incinerator and killing and removing them from the hog barn. *Id.* at ¶¶ 88, 89. Plaintiff Narramore alleges that Defendants Short, Goolsby, and Harris each instructed him to continue incinerating infected hogs even after a Brucellosis outbreak was confirmed as early as August 1, 2019. *Id.* at ¶ 90.

Specifically, after the first five hogs had been killed on August 16, 2019, Plaintiff Narramore alleges that Defendants Short, Goolsby and Harris each instructed him to kill infected hogs with a pickaxe without providing adequate equipment, and that he killed five hogs with a pickaxe and inadequate PPE, covering him in hog blood. *Id.* at ¶¶ 94–98. Plaintiff Narramore alleges that he was never given anything to clean himself. *Id.* at ¶ 99. Plaintiff Narramore claims that he suffered from the signs and symptoms of Brucellosis including, orange and runny stool, headaches, shortness of breath, fever, dizziness, lightheadedness, and had a rash that itched and burned. *Id.* at ¶ 103.

### c. Plaintiff Lashley

Plaintiff Lashley alleges that he worked at the farrowing barn in the Powledge Unit for approximately a year and was responsible for breeding hogs. *Id.* at ¶ 104. Plaintiff Lashley alleges he was often exposed to hog bodily fluids and was not provided with adequate PPE. *Id.* at ¶¶ 105, 106. Plaintiff Lashley alleges that he started experiencing the symptoms of Brucellosis toward the end of September 2019, including a weight loss of twenty pounds in two weeks, hot flashes, fever, sweating, and orange and runny stool. *Id.* at ¶ 107. On October 16, 2019, Plaintiff Lashley was placed on an IV after testing positive for Brucellosis and was given antibiotics that he had to take for 13 weeks. *Id.* at ¶¶ 108–110.

### d. Plaintiff Morrow

Plaintiff Morrow alleges that he worked at the farrowing barn at the Powledge Unit for approximately nine months and was responsible for breeding hogs. *Id.* at ¶ 111. Plaintiff Morrow alleges he was often exposed to hog bodily fluids and was not provided with adequate PPE. *Id.* at ¶¶ 113, 114. Plaintiff Morrow alleges that he tested positive for Brucellosis on September 13, 2019 and suffered dizziness, weight loss, and liver problems. *Id.* at ¶¶ 115, 116. Plaintiff Morrow alleges

that he tested positive until December of 2019 and was on antibiotics for three months. *Id.* at ¶¶ 117, 118.

Based on these factual allegations Plaintiffs allege a failure to protect claim for violation of the Eighth Amendment pursuant to 42 U.S.C. § 1983. (Doc. No. 2, at 24–36.) Plaintiffs request punitive damages as well as compensatory damages for physical injuries, pain and suffering, emotional distress, and mental anguish. *Id.* at 37. Plaintiffs further request their attorney's fees in this matter. *Id.* at 38.

## II.    Defendant's Answer

Defendants filed an answer on October 12, 2021, admitting that they were employed by TDJC, which is an agency of the State of Texas. (Doc. No. 15, at ¶¶ 2, 3.) Defendants further admit that at all relevant times they were acting under color of state law and within the scope of their employment. *Id.* at ¶¶ 5, 6. Defendants deny the remainder of the allegations and deny liability. *Id.* at ¶¶ 6–15. Defendants allege immunity pursuant to the Eleventh Amendment, as well as affirmative defenses of qualified immunity, failure to exhaust, and bar by the statute of limitations. *Id.* at ¶¶ 17–20. Defendants further allege that Plaintiffs have not asserted more than a *de minimus* injury and are not entitled to recover compensatory damages. *Id.* at ¶ 16.

## III.    Defendant's Summary Judgment Evidence

In support of their motion for summary judgment, Defendants submit the grievance records of Plaintiff Narramore (Doc. No. 46); the deposition transcript of Vernon Mitchell (Doc. No. 46-1); the deposition transcript of Matthew Goolsby (Doc. No. 46-2); the deposition transcript of Keith Beam (Doc. No. 46-3); the deposition transcript of Michael Harris (Doc. No. 46-4); the deposition transcript of James Short (Doc. No. 46-5); TDJC records regarding Plaintiff Morrow (Doc. No. 46-6; Doc. No. 45-2); TDCJ animal testing and farm safety records (Doc. No. 46-7);

TDCJ records for purchase and delivery of hogs and training records for Plaintiffs (Doc. No. 46-8); TDCJ records for Swine Brucellosis training (Doc. No. 46-9); TDCJ medical records for Plaintiff Narramore (Doc. No. 45-3); and TDJC medical records for Plaintiff Thornton (Doc. No. 45-4). A discussion of relevant deposition testimony is contained below in the court's analysis; however, a summary of relevant records is discussed below.

### a. Plaintiff Morrow's Records

TDCJ records show that Plaintiff Morrow was first assigned to the farrowing barn on November 16, 2018. (Doc. No. 46-6, at 7.) On August 31, 2019, Plaintiff Morrow filled out a "Provider Sick Call" stating that he works at the hog barn with infected pigs and has been sick for two weeks, including cold sweats, dizziness, and swelling, and requested to be checked for Brucellosis. (Doc. No. 45-2, at 128.) Plaintiff Morrow was seen on September 5, 2019, with records of dizziness, fever, and cold sweats. *Id.* at 57–58. He followed up with a "Nurse Sick Call" on September 6, 2019, stating he did not feel well and cited cold sweats. *Id.* at 127. The records show that on September 10, 2019, he stated he no longer wanted to be seen and signed a refusal of treatment. *Id.* at 8, 126. The records show that on September 13, 2019, he tested positive for Brucellosis. *Id.* at 125. He was immediately started on both IV and oral antibiotics. *Id.* at 124. The records indicate that Plaintiff Morrow did show up for IV treatment as early as September 14, 2019 and continued daily IV flushes through September 18, 2019. *Id.* at 115–19. Plaintiff Morrow refused treatment for a provisional diagnosis of Brucellosis on October 1, 2019. *Id.* at 7. Plaintiff Morrow continued to test positive for Brucellosis as of October 17, 2019. *Id.* at 104. Medical notes indicated Plaintiff Morrow still had high Brucella antibodies as of December 10, 2019. *Id.* at 49. At this time, Plaintiff Morrow was trying to get medical restrictions lifted so that he could work in

the dog kennel. *Id.* at 46–47. Plaintiff Morrow no-showed for an appointment on December 30, 2019 and did not reschedule. *Id.* at 9.

### b.  Plaintiff Narramore's Records

On September 17, 2019, Plaintiff Narramore was seen for dizziness, nausea, flank pain, hot flashes, and rash. (Doc. No. 45-3.) On September 18, 2019, a Brucella antibody lab was ordered. *Id.* at 36. Lab results showed no Brucella antibodies on September 20, 2019. *Id.* at 21. On October 2, 2019, Plaintiff Narromore's Brucella antibodies were again low and it was noted that there were no signs of Brucellosis or complaints of such by Plaintiff Narramore. *Id.* at 53. Verbal orders were given to repeat Brucella antibody testing on October 23, 2019. *Id.* at 45. On that same date, lab results returned negative for Brucellosis. *Id.* at 34. Plaintiff Narramore had a telehealth visit on October 29, 2019 for fever and sore throat, and was given Tylenol. *Id.* at 32. Brucella labs were again conducted on that date and antibodies were low, indicating no Brucellosis. *Id.* at 13. The remainder of Plaintiff Narramore's medical records relate primarily to his management of joint pain with Naproxen. (Doc. No. 45-3.)

### c.  Plaintiff Thornton's Records

On August 31, 2019, Plaintiff Thornton filled out a "Provider Sick Call" stating that he worked in the hog barn and was in contact with sow's blood and would like to be tested for Brucellosis due to the confirmed infected hogs. (Doc. No. 45-4, at 153.) Notes indicated that on September 5, 2019 an appointment was rescheduled due to time constraints. *Id.* at 154. Plaintiff Thornton filled out another request on September 6, 2019, stating his contact with infected sows. *Id.* at 152. Plaintiff Thornton was seen on September 16, 2019 by FNP Irene Oyolu, was given a provisional diagnosis of Brucellosis, and was sent to Palestine Regional Medical Center to evaluate Brucellosis exposure three to four weeks prior due to confirmed case of Brucellosis on the unit

from the hog barn. *Id.* at 60, 94. Plaintiff Thornton was seen at Palestine Regional Medical Center on September 16, 2019 for body aches, fever, and general malaise and possible Brucellosis was noted. *Id.* at 145–48. Plaintiff Thornton was returned to the Powledge Unit with Ibuprofen and Zofran while results for Brucellosis were sent out to result in five to seven days. *Id.* at 140. Plaintiff Thornton was given IV antibiotics starting on September 17, 2019 and continuing through September 23, 2019. *Id.* at 93, 133–34. Records indicate that Plaintiff Thornton's Brucella antibody labs were drawn on September 24, 2019, and reported as high on September 29, 2019. *Id.* at 32. On September 30, 2019, Plaintiff Thornton filled out a "Provider Sick Call" asking for his Brucellosis results. *Id.* at 132. Plaintiff Thornton was provided his positive results on October 3, 2019. *Id.* at 51.  On October 17, 2019, Plaintiff Thornton filled out a "Nurse Sick Call" noting that he was taking antibiotics for Brucellosis and was having trouble urinating. *Id.* at 131. Medical notes indicate that Plaintiff Thornton received a week's worth of IV antibiotics and continued on oral antibiotics for eight weeks. *Id.* at 128. Plaintiff Thornton was seen by an infectious disease specialist on November 7, 2019 for evaluation of Brucellosis. *Id.* at 44. Plaintiff Thornton had another Brucella antibody draw on November 7, 2019, and his results reported high on November 11, 2019. *Id.* at 22. On December 2, 2019, Plaintiff Thornton complained again that it had been 18 days since his last Brucellosis test and he had not been seen. *Id.* at 127. Plaintiff Thornton was seen the next day on December 3, 2019, informed again of his Brucellosis, instructed to complete antibiotics, and to go to the ER for any worsening of symptoms and another Brucellosis lab. *Id.* at 42. Plaintiff Thornton had a Brucella antibody draw on December 17, 2019, and labs reported high results on December 22, 2019. *Id.* at 15.

### d. TDCJ Animal Testing and Farm Safety Records

U.S. Department of Agriculture ("USDA") testing records indicate that samples were collected from swine at TDCJ Beto Unit on July 24, 2019, and that positive Brucellosis results were completed on August 13, 2019. (Doc. No. 46-7, at 5.) Additional positive results for Swine Brucellosis from collections taken at the Beto Unit on August 6, 2019, returned on August 21, 2019. *Id.* at 9. More positive results from collections taken on August 16, 2019 at the Beto Unit, returned on August 30, 2019. *Id.* at 14–15, 156–57. Samples collected from Beto Unit swine on August 19, 2019, returned positive on September 6, 2019. *Id.* at 27–32. Samples collected from Beto Unit swine on August 20, 2019, returned positive on September 17, 2019. *Id.* at 46–55, 181–90. Samples collected from Powledge Unit swine on August 21, 2019, returned positive on September 16, 2019. *Id.* at 95–108, 167–80. Samples collected from Powledge Unit swine on August 22, 2019, returned positive on September 18, 2019. *Id.* at 70–78, 158–66. Semen samples collected from Powledge Unit swine on August 23, 2019 returned positive on September 10, 2019. *Id.* at 154–55. Samples collected from Michael Unit swine on August 21, 2019, returned positive on September 12, 2019. *Id.* at 120–22.

### e. TDCJ Purchase and Training Records

TDCJ records show that Plaintiff Morrow was enrolled as a farrowing barn worker on November 16, 2018, and that he completed various safety and training criteria in connection with the job. (Doc. No. 46-8, at 1–6, 23–26.) Plaintiff Narramore was enrolled as a farrowing barn worker on September 27, 2018, and he also completed TDCJ's safety and worker training in connection with the job. *Id.* at 7–10, 19–22. Plaintiff Thornton was enrolled as a farrowing barn worker on August 13, 2018, and he also completed TDCJ's safety and worker training in

connection with the job. *Id.* at 11–14, 16–17. Plaintiff Lashley also received training with respect to employment at the hog barn. *Id.* at 27–30.

TDCJ has also provided records of the sale and shipment of the herd to DAR PRO. *Id.* at 33–66.

### f.   TDCJ Swine Brucellosis Training Records

A February 25, 2020 email from Dr. Eric Kneese, a veterinarian at Texas A&M University, provided directive on transmission of Swine Brucellosis, clinical signs in swine, human health, protections for the farrowing barn and boar collection, and measures for disinfection. (Doc. No. 46-9.) The notes indicate that Swine Brucellosis is a bacterial disease carried by feral swine and is transmitted through infected tissues or bodily fluids. *Id.* at 2. Clinical signs in sows are listed as infertility, bacteria in blood, abortions, and vulvar discharge. *Id.* Clinical signs in boars are listed as swollen testicles, lameness, and fever. *Id.* Clinical signs in piglets are listed as paralysis of hind legs; and clinical signs in weaners and growers are listed as swollen testicles, lameness, and abortions. *Id.*

The notes indicate that the presence of Brucellosis in people is marked by "flu-like" symptoms such as undulant fever, sweats, headaches, muscle pain, and general weakness. *Id.* at 3. The notes instruct that:

> A sign should be posted on the Isolation stall to inform personnel that Personal Protective Equipment (PPE) and precautions need to be taken. Proper PPE should include rubber boots, boot covers, and gloves.
>
> - Wear protective clothing when working around pigs.
>
> - Remove or change protective clothing when returning to living quarters or eating.
>
> - Wear latex/nitrile/vinyl gloves when handling pigs or potentially infected materials.

- Protect your eyes against splashing potentially infected fluids into them.

- Do not touch your eyes or put your fingers or any instruments on or in your mouth when working with pigs.

- Protect any bare skin on your arms or face that might have cuts and abrasions.

The notes also indicate that workers at the highest risk are those that work closely with bodily fluids of pigs, especially reproductive fluids. *Id.* Instruction for transmission prevention in the farrowing barn include:

- Wear latex/nitrile/vinyl gloves when handling pigs and placentas.

- Do not pull piglets in potentially affected sows. Identify those sows to the boss as soon as possible so they can be assisted according to protocol.

- Wash hands after removing gloves.

*Id.*

Instructions for boar collection included:

- Wear nitrile/vinyl gloves when handling boars and semen.

- Wear a face shield during collection to protect your eyes against splashing potentially infected fluids into them.

- Protect any bare skin on your arms or face that might have cuts and abrasions.

- Wash hands after removing gloves.

*Id.*

Lastly, Dr. Kneese's instructions on disinfection state that Brucella is killed by most commonly available disinfectants, and instructs that after removing all organic material, contaminated surfaces should be diluted with bleach or isopropyl alcohol. *Id.* at 4.

12

IV.    **Plaintiffs' Summary Judgment Evidence**

In support of their opposition to summary judgment, Plaintiffs presented the excerpts of the deposition transcripts of Plaintiff Thornton (Doc. No. 52-1), Plaintiff Narramore (Doc. No. 52-2), Plaintiff Lashley (Doc. No. 52-3), Plaintiff Morrow (Doc. No. 52-4), Defendant Short (Doc. No. 52-2), Defendant Goolsby (Doc. No. 52-6), Defendant Harris (Doc. No. 52-7), Defendant Beam (Doc. No. 52-8), and Defendant Mitchell (Doc. No. 52-9). Portions of these transcripts will be discussed as relevant to the court's analysis herein.

a.    **Plaintiffs' Grievance Records**

Plaintiffs also submitted the grievance records of Plaintiff Thornton (Doc. No. 52-10), Plaintiff Narramore (Doc. No. 52-11), Plaintiff Lashley (Doc. No. 52-12), and Plaintiff Morrow (Doc. No. 52-13).

i.    **Plaintiff Thornton's Grievance Records**

The records show that on December 18, 2019, Plaintiff Thornton filed a Step 1 grievance stating that he was not notified he could contract disease when he started at the Powledge Unit hog barn, that he was not trained on how to protect himself from contracting Brucellosis, that he was not given proper PPE, and that he did not receive proper medical care when he got sick. (Doc. No. 52-10, at 2.) Plaintiff Thornton received a response on January 7, 2020, stating that his grievance was investigated, that all offenders are trained in safety when assigned to a job, and that he received all training along with a certificate of completion. *Id.* at 7. The response further instructed him to talk to his supervisor if he felt he was not adequately trained. *Id.* The records also include the safety training records, acknowledgements, and certificate of completion. *Id.* at 9–13.

### ii.  Plaintiff Narramore's Grievance Records

The records show that on December 18, 2019, Plaintiff Narramore filed a Step 1 grievance stating that he was knowingly exposed to Brucellosis, that he was not trained on how to deal with the outbreak, that he was not given proper safety gear, that he was given false knowledge about the spread of disease, and that there was a delay in medical care. (Doc. No. 52-11, at 2.) Plaintiff Narramore received a response on January 7, 2020, stating that his grievance was investigated, that all offenders are trained in safety when assigned to a job, and that he received all training along with a certificate of completion. *Id.* at 5. The response further instructed him to talk to his supervisor if he felt he was not adequately trained. *Id.* The records also include the safety training records, acknowledgements, and certificate of completion. *Id.* at 7–11.

### iii.  Plaintiff Lashley's Grievance Records

The records show that on December 18, 2019, Plaintiff Lashley filed a Step 1 grievance stating that he was not trained on how to protect himself from getting Brucellosis, that he was not given proper safety equipment, and that there was a delay in his testing and medical care. (Doc. No. 52-12, at 9.) Plaintiff Lashley received a response on January 7, 2020, stating that his grievance was investigated, that all offenders are trained in safety when assigned to a job, and that he received all training along with a certificate of completion. *Id.* at 12. The response further instructed him to talk to his supervisor if he felt he was not adequately trained. *Id.* The records also include the safety training records, and acknowledgments. *Id.* at 14–17. Plaintiff Lashley also has a Step 1 grievance from December 22, 2019 where he states he has Brucellosis and requests extra toilet paper. *Id.* at 28–29.

### iv.  Plaintiff Morrow's Grievance Records

Plaintiff Morrow has a series of grievances filed related to contracting Brucellosis. (Doc. No. 52-13, at 2, 17, 26, 33, 50–53.) Plaintiff Morrow's grievances similarly complain that he did not receive adequate training, that he was not warned about the spread or seriousness of Brucellosis, that he was not given sufficient PPE, and that he received delays in medical care related to his testing and treatment for Brucellosis. *Id.*

### b.  Plaintiffs' Medical Records

Plaintiffs also submit the medical records of Plaintiffs Thornton (Doc. No. 52-14), Lashley (Doc. No. 52-15), Morrow (Doc. No. 52-16), and Narramore (Doc. No. 52-20) in response to summary judgment. As the court has already summarized the medical records submitted for Plaintiffs Thornton, Morrow, and Narramore, the court will not resummarize herein, and instead will only address any conflicts in the records.

### i.  Plaintiff Lashley's Records

Defendants did not submit any evidence of Plaintiff Lashley's medical records. Plaintiffs, however, have submitted a comprehensive compilation of Plaintiff Lashley's medical records while incarcerated. (Doc. No. 52-15.)  Of relevance, the records show that on September 19, 2019, Plaintiff Lashley was tested for Brucellosis and the results came back normal, or negative, on September 25, 2019. *Id.* at 92. On October 8, 2019, Plaintiff Lashley was again tested for Brucellosis and his results came back "high" for Brucella antibodies on October 14, 2019. *Id.* at 82. Plaintiff Lashley received oral and IV antibiotics for treatment. *Id.* at 294–95. On August 20, 2020, it was noted that Plaintiff Lashley had history of Brucellosis and a right lung abscess requiring treatment. *Id.* at 326–28.

### c. Other Summary Judgment Evidence

Plaintiffs also submit the shipping records for livestock at TDCJ (Doc. No. 52-17), the safety information on dealing with Swine Brucellosis (Doc. No. 52-18), and the animal testing records of the Powledge Unit (Doc. No. 54). Again, the court will not resummarize these documents except to the extent there is a relevant conflict. Additionally, Plaintiffs submit correspondence between Colleen Terry and the Office of TDCJ Health Services Division (Doc. No. 52-19.) Colleen Terry is the sister of Plaintiff James Thornton, who wrote a letter on October 1, 2019, wherein she discusses the conditions of the hog barn and the spread of Brucellosis. *Id.* at 3. Ms. Terry received a response from the Office of the Governor stating that her letter would be forwarded to TDCJ's Health Services Division as well as TDCJ's ombudsman. *Id.* at 8. On October 22, 2019, Ms. Terry received a response from TDCJ's Health Services Division that summarized Plaintiff Thornton's medical records regarding his testing and treatment for Brucellosis. *Id.* at 10–11.

## LEGAL STANDARD

A motion for summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The Supreme Court has interpreted the plain language of Rule 56 as mandating "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex*, 477 U.S. at 323–25). A fact is material if it might affect the outcome of the suit under the governing law. *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Merritt-Campbell, Inc.*, 164 F.3d at 961. If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

If the movant meets this burden, Rule 56 requires the opposing party to go beyond the pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1180 (5th Cir. 1996); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046–47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585 (1986); *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075.

When ruling on a motion for summary judgment, the court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *Merritt-Campbell, Inc.*, 164 F.3d at 961. However, the court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum*

*Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as modified*, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a reasonable jury to return a verdict in the opposing party's favor, there is no genuine issue for trial, and summary judgment must be granted. *Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 249–51; *Texas Instruments*, 100 F.3d at 1179.

## DISCUSSION

Defendants argue that they are entitled to summary judgment because: (1) Plaintiff Narramore did not exhaust all the available administrative remedies prior to filing suit; (2) Defendants Mitchell and Beam lack personal involvement necessary to maintain a claim; and (3) all Defendants are entitled to qualified immunity. (Doc. No. 45.) Plaintiffs respond that Plaintiff Narramore could not exhaust administrative remedies because they were unavailable; that Defendants Mitchell and Beam had personal involvement necessary to maintain a claim against them; and that Defendants are not entitled to qualified immunity. (Doc. No. 52.)

### I.    Exhaustion as to Plaintiff Narramore

Defendants first move for summary judgment on the basis that Plaintiff Narramore has not exhausted administrative remedies. (Doc. No. 45, at 9–12.) Specifically, Defendants claim that although Plaintiff Narramore filed a Step 1 grievance on December 18, 2019, Plaintiff Narramore did not file a Step 2 grievance. Plaintiffs argue that administrative procedures were not available to Plaintiff Narramore because they operated as a dead end, with officers unwilling to provide relief to Mr. Narramore. (Doc. No. 52, at 23.)

It is well-settled that inmates must exhaust any and all administrative remedies before proceeding in federal court. *See Gonzalez v. Seal*, 702 F.3d 785, 787 (5th Cir. 2012) (explaining that pre-filing exhaustion is both mandatory and non-discretionary). Congress enacted the Prison

Litigation Reform Act ("PLRA") in 1996, which mandated that no action shall be brought by a prisoner "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

The purpose of the prison exhaustion requirement is to "provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit." *See Bisby v. Garza*, 342 F. App'x 969, 971 (5th Cir. 2009); *see also Patterson v. Stanley*, 547 F. App'x 510, 511 (5th Cir. 2013) (explaining that the primary purpose of a grievance is to give prison officials fair opportunity to address the problem that will later form the basis of the lawsuit); *Johnson v. Johnson*, 385 F.3d 503, 516 (5th Cir. 2004) (interpreting the exhaustion requirement in light of its purpose, which "include the goal of giving officials time and opportunity to address complaints internally.") (internal quotations and citation omitted).

The exhaustion provision was unanimously upheld by the Supreme Court in *Booth v. Churner*, 532 U.S. 731 (2001). The Court subsequently held that exhaustion is mandatory, and that the requirement will not be excused when an inmate fails to properly exhaust his administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). Proper exhaustion means that an inmate must not only pursue all available avenues of relief but must also comply with all administrative deadlines and procedural rules. *Id.* at 90–91. The Fifth Circuit reiterated the principle that "[p]re-filing exhaustion is mandatory, and the case must be dismissed if available administrative remedies were not exhausted." *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012).

The Supreme Court elaborated further about the exhaustion requirement in *Jones v. Bock*, 549 U.S. 199 (2007). It was noted that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Id.* at 211. It was added, however, that the "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specifically plead or demonstrate exhaustion in their complaints." *Id.* at 216. In

19

light of *Jones v. Bock*, the Fifth Circuit provided guidance concerning how the exhaustion question should be handled in *Dillon v. Rogers*, 596 F.3d 260 (5th Cir. 2010). The following procedures were outlined:

> As a final matter, we now provide a brief summary of how district courts should approach exhaustion questions under the PLRA. When the defendant raises exhaustion as an affirmative defense, the judge should usually resolve disputes concerning exhaustion prior to allowing the case to proceed on the merits. If the plaintiff survives summary judgment on exhaustion, the judge may resolve disputed facts concerning exhaustion, holding an evidentiary hearing if necessary.

*Id.* at 272–73.

A prisoner's failure to exhaust certain claims before filing suit in federal court is fatal to those unexhausted claims only. *See Jones*, 549 U.S. at 924 ("There is no reason failure to exhaust on one [claim] necessarily affects any other.").  Failure to exhaust administrative remedies is an affirmative defense on which a defendant must bear the burden of proof. *Jones*, 549 U.S. at 216; *see Abbott v. Babin*, 587 F. App'x 116, 118 (5th Cir. 2014) ("When defendants seek to avail themselves of the affirmative defense of failure to exhaust, they bear the burden of showing that administrative remedies were not exhausted"); *see also Morgan v. Texas Dep't of Criminal Justice McConnell Unit*, 537 F. App'x 502, 508 (5th Cir. 2013) (same); *Dillon*, 596 F.3d at 266 (noting that prison officials "must establish beyond peradventure all of the essential elements of the defense of exhaustion"). Moreover, "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216.

It is presumed that Plaintiff Narramore has exhausted his administrative remedies unless proven otherwise by Defendants. Here, Defendants have attached Plaintiff Narramore's grievance record (Doc. No. 46), but have submitted no affidavits in support of their exhaustion defense relating to the grievance procedures or explaining what occurred with respect to Plaintiff's

Narramore's grievance. As such, the court can only interpret the records at face value. Here, it appears that on December 18, 2019, Plaintiff Narramore filed a Step 1 grievance stating that he was knowingly exposed to Brucellosis, that he was not trained on how to deal with the outbreak, that he was not given proper safety gear, that he was given false knowledge about the spread of disease, and that there was a delay in medical care. (Doc. No. 46, at 3.) On January 7, 2020, the grievance was investigated and a response from Warden Bowman was provided stating that all offenders are trained in safety when assigned to a job, that he received all training along with a certificate of completion, and that he should talk to his supervisor if he felt he was not adequately trained. *Id.* at 4. The response further stated that no further action was warranted. *Id.* Plaintiff Narramore contends that the statement directing him to talk to his supervisors who were the subject of his grievance, led to a procedural dead end. (Doc. No. 52, at 24.) The court agrees that because the response to Plaintiff Narramore's grievance directed him to talk to his supervisors for further action regarding his grievance, rather than to appeal his grievance through the outlined procedures, a question of material fact exists with respect to whether exhaustion of administrative remedies were available to Plaintiff Narramore. *See, e.g., Davis v. Fernandez,* 798 F.3d 290, 296 (5th Cir. 2015) (concluding the second step of the jail's grievance process was unavailable to plaintiff where jail staff told him that the grievance process includes only a single step—that he had no option to appeal); *Brown v. Croak*, 312 F.3d 109, 111–12 (3d Cir. 2002) (holding that administrative remedies were unavailable where the prison officials erroneously told the prisoner that he must wait until the investigation was complete before filing a grievance). As such, summary judgment is not appropriate on Defendants' affirmative defense of exhaustion and the court will therefore consider the merits of Defendants' motion.

## II.    Qualified Immunity[2]

The doctrine of "qualified immunity" protects government officials from "liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 800 (1982). The qualified immunity inquiry determines whether a plaintiff has shown "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd,* 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818). The court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

An additional consideration exists in the analysis of a qualified immunity defense on a motion for summary judgment. Once a defendant invokes qualified immunity, "the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *McCreary v. Richardson*, 738 F.3d 651, 655 (5th Cir. 2013) (internal citation omitted). Thus, although the court "draws all factual inferences in favor of the non-movant, . . . once the issue of qualified immunity is raised, the non-movant (*i.e.* the plaintiff in this case) bears the burden of rebutting the defense." *See Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) ("[w]e do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs."); *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) ("the plaintiff bears the burden of negating qualified immunity…"). "The plaintiff can defeat summary judgment by rebutting the qualified immunity defense as a matter of law or by raising a genuine

---

[2] Because, for the reasons stated herein, the court finds that Defendants are entitled to qualified immunity, the court will not consider herein Defendants Mitchell's and Beam's arguments that they are entitled to summary judgment due to the lack of their personal involvement with respect to the alleged constitutional violations.

fact dispute that is material to the issue of immunity." *Johnson v. Eggebrecht*, No. 9:14-CV-144, 2015 WL 9703791, at *4 (E.D. Tex. Dec. 28, 2015), *report and recommendation adopted*, No. 9:14-CV-144, 2016 WL 165091 (E.D. Tex. Jan. 14, 2016) (citing *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015)). "[S]ummary judgment should be denied if the plaintiff's version of the facts would permit a finding that the official is not entitled to qualified immunity." *Id.* (citing *Lytle v. Bexar Cnty.*, 560 F.3d 404, 418 (5th Cir. 2009)).

### a. Alleged Constitutional Violations

As discussed above, Plaintiffs allege that Defendants violated the Eighth Amendment by acting with deliberate indifference by disregarding an excessive risk to the health and safety of Plaintiffs presented by the conditions of the Powledge Unit hog barn. (Doc. No. 2.)

### i. Deliberate Indifference

Defendants move for summary judgment on qualified immunity on Plaintiffs' Eighth Amendment deliberate indifference claim. (Doc. No. 45, at 16–23.) Plaintiffs argue that Defendants were deliberately indifferent to Plaintiffs' substantial risk of contracting a communicable disease—that Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that they drew that inference. (Doc. No. 52, at 27–35.)

Plaintiffs' deliberate indifference claim arises under the Eighth Amendment and its prohibition against cruel and unusual punishment, which prohibits the unnecessary and wanton infliction of pain. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991) (citing *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). The prohibition against cruel and unusual punishment mandates that prisoners be afforded humane conditions of confinement and that they receive adequate food, shelter, clothing, and medical care. *Herman v. Holiday,* 238 F.3d 660, 664 (5th Cir. 2001); *see also Harper v.*

*Showers,* 174 F.3d 716, 719 (5th Cir. 1999) (recognizing that "[t]he Constitution does not mandate comfortable prisons ... but neither does it permit inhumane ones"). Prison work assignments are considered conditions of confinement subject to scrutiny under the Eighth Amendment. *Choate v. Lockhart*, 7 F.3d 1370, 1373 (8th Cir. 1993). To establish an Eighth Amendment violation based on prison workplace safety, a plaintiff must show deliberate indifference. *Id.; see also Estelle,* 429 U.S. at 97 (1976) (deliberate indifference required for Eighth Amendment claim for inadequate medical care); *Wilson*, 501 U.S. at 294 (deliberate indifference required for Eighth Amendment claim challenging living conditions).

A constitutional violation occurs only when two requirements are met. First, there is the objective requirement that the condition "must be so serious as to 'deprive prisoners of the minimal civilized measure of life's necessities,' as when it denies the prisoner some basic human need." *Harris v. Angelina Cnty., Tex.,* 31 F.3d 331, 334 (5th Cir. 1994) (citing *Wilson,* 501 U.S. at 304). Second, under a subjective standard, the court must determine that the prison officials responsible for the deprivation have been "deliberately indifferent to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

In applying this standard, the determinative question is whether a prison official subjectively knew that a prisoner faced a substantial risk of serious harm yet disregarded that risk by failing to take reasonable steps to abate it. *Id.* To be found to have been deliberately indifferent, a prison official must be found to have personally been aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, and the official must also be found to have drawn the inference. *Id.* at 837.

As an initial manner, Plaintiffs have provided numerous factual allegations with respect to the hog barn conditions and the spread of Brucellosis without any clearly delineated Eighth

Amendment claims. The court has attempted to organize the copious factual allegations to analyze Plaintiffs' claims herein. Specifically, at the onset of the outbreak of Brucellosis at the Powledge Unit, Plaintiffs contend that Defendants were aware from safety briefing that Brucellosis is transmitted by ingestion of infected tissues or fluids. (Doc. No. 52, at 29, citing Doc. Nos. 52-18, 52-6, at 96:2–9.)[3] Plaintiffs cite to Defendant Goolsby's deposition transcript for his statement that on the first day of killing infected hogs (in mid-August 2019), the person doing the killing had to wear a face shield, and that he was generally aware of how Brucellosis was contracted either through blood or air. (Doc. No. 52, at 29, citing Doc. No. 52-6, at 89:1–23, 90:9–15, 92:15–93:24, 96:2–9.) Defendant Goolsby's testimony suggests that Defendant Beam may have also been present at the initial extermination, and that generally other employees would have some knowledge of how Brucellosis was spread because they are livestock specialists. (Doc. No. 52-6, at 90:9–15; 93:20–24.) Plaintiffs cite again to Defendant Goolsby's testimony that he, Defendant Harris, and Defendant Short were involved in extermination of infected hogs and that they wore Tyvek suits. (Doc. No. 52, at 30, citing Doc. No. 52-6, at 80:1–20.) Similarly, Plaintiffs only cite to Defendant Goolsby's testimony that he was aware that insemination equipment had malfunctioned and bodily fluids could be ejected from the tubes. *Id.* at 53:4–14. Plaintiffs infer that Defendant Beam was aware of the malfunctioning equipment as Defendant Goolsby testified that Defendant Beam was in charge of replacing malfunctioning equipment. *Id.* at 54:1–6. Plaintiffs only otherwise suggest that Defendants Short, Harris, and Beam had some knowledge

---

[3] Plaintiffs' cited document regarding safety information is provided without any custodial record or established context for the safety briefing. (Doc. No. 52-18.) It appears, however, to be an excerpt of the information that was sent from Dr. Eric Kneese, DVM, on February 25, 2020. (Doc. No. 46-9.) Thus, there is nothing in the record to indicate that any of the Defendants had knowledge of the cited Brucellosis signs, transmission, or protocol for prevention at the time the spread of infection occurred between August and December 2019. Therefore, this document on its own fails to establish the requisite knowledge. As discussed herein, the evidence instead shows that Defendants might have had some general knowledge that Brucellosis was spread by blood or air and that they should wear PPE when dealing with infected hogs. (Doc. No. 52-6, at 89:1–23, 90:9–15, 92:15–93:24, 96:2–9.)

because they were present at the time the veterinarian disposed of the infected hogs. *Id.* at 79:11–80:1. Plaintiffs further cite testimony from Plaintiff Thornton that he informed Defendants Harris, Goolsby, Short about issues with the hogs, and that he talked to Defendant Mitchell after he contracted Brucellosis regarding how he might have contracted it from bodily fluids getting on him. (Doc. No. 52-1, at 31:16–32:25.)

This evidence, taken in the light most favorable to Plaintiffs, at best demonstrates that Defendant Goolsby and Defendant Beam had actual knowledge about Brucellosis safety concerns and malfunctioning insemination equipment. To the extent it could be said that Defendants Goolsby or Beam were therefore aware of the possibility of the spread of Brucellosis in the hog barn, it cannot be said that they actually drew that inference. Plaintiffs fail to provide any evidence that Defendants actually drew an inference of the substantial risk of harm based on their knowledge of safety measures, the spread of Brucellosis, and the conditions of the hog barn. The suggestion that Defendants Beam and Short told inmates that the only way to contract a disease was by having intercourse with the hogs does not, even if true, suggest that Defendants had drawn the risk of serious harm and refused to abate it.

Plaintiffs further appear to also be raising claims that after cases of Brucellosis were known to Defendants, they failed to provide proper equipment or training and put Plaintiffs in the line of harm. Plaintiffs note that after five hogs tested positive for Brucellosis in the hog barn, operations did not cease. (Doc. No. 52, at 33, citing Doc. No. 52-5, at 76:21–25, 77:1–17; Doc. No. 52-6, at 62:20–25, 64:1–14; Doc. No. 52-1, at 43:4–25; Doc. No. 52-7, at 50:1–17.) Plaintiffs suggest that Defendants became aware of positive cases of Brucellosis, but kept operations going because they "had to feed the hogs." (Doc. No. 52-6, at 110:2–18.) Plaintiffs further point to evidence to suggest that after the hogs tested positive, they were not given gloves, equipment, or training to protect

26

them from contracting Brucellosis. (Doc. No. 52, at 33, citing Doc. No. 52-8, at 42:10–16; Doc. No. 52-2, at 57:1–58:16, Doc. No. 52-7, at 64:13–65:4.) The cited testimony actually establishes that Plaintiffs were given the PPE that they always had when dealing with the hogs, not that they were not provided any PPE at all. *Id*. Equipment included rubber gloves, rubber boots, boot liners, and a mask. (Doc. No. 46-3, at 33:20–34:2.) Plaintiffs' claim, instead, appears to arise from an alleged disparity in treatment because TDCJ workers were given Tyvek suits prior to and during the depopulation of the hogs. Defendant Short's testimony, however, indicates that if an inmate requested a Tyvek suit, they were given one. (Doc. No. 46-5, at 36:13–18.) Defendant Goolsby similarly testified that inmates were provided Tyvek suits. (Doc. No. 46-2, at 66:16–67:2.)

As the summary judgment evidence shows, the inmates were provided PPE—rubber boots, boot liners, gloves, and masks—and Tyvek suits upon request.  To the extent that any of the Defendants knew that Brucellosis could be contracted by exposure to bodily fluids, providing PPE to inmates was a reasonable response to the protection from exposure, even though the harm was not ultimately averted—*i.e*., the inmates actually contracting Brucellosis.  *See Farmer*, 511 U.S. at 844 ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). Even if the court were to completely discredit Defendants' testimony to construe the testimony in the light most favorable to Plaintiffs, a failure to provide adequate equipment or training at best suggests negligence on the part of Defendants. It does not, however, rise to the level of a constitutional violation. *See Wilson*, 501 U.S. at 305 (holding that mere negligence would not satisfy the "deliberate indifference" standard); *Lee v. Sikes*,[4] 870 F. Supp. 1096, 1098–1100

---

[4] In *Lee*, a prisoner working in the farrowing barn was attacked by a boar hog resulting in injuries. *Lee*, 870 F. Supp. at 1098. In that case, the prisoner was not trained upon starting at the farrowing barn, was not given any equipment to help move the hogs, was not provided any safety rules, and was unsupervised at the time of the incident. *Id*. at 1099–1100. Given these facts, the court concluded that even if Defendants "knew that boar hogs were dangerous or knew

(S.D. Ga. 1994) (granting summary judgment on plaintiff's Eighth Amendment workplace safety claim because even if Defendants "knew that boar hogs were dangerous or knew that protective equipment should be used, such a showing falls short of creating a genuine issue of deliberate indifference to workplace safety" and at best showed that defendants were negligent).

Plaintiffs further appear to suggest a claim based upon being asked to assist in the killing of infected hogs and in the testing of the hogs. (Doc. No. 52, at 34, citing Doc. No. 52-2, at 62:15–25, 64:1–25; Doc. No. 52-6, at 88:9–12, 89:1–23; Doc. No. 52-8, at 58:12–25.) Both Defendant Goolsby and Defendant Harris unequivocally testified that no inmates were present when infected hogs were being killed or when they were being loaded onto trailers for transport. (Doc. No. 46-2, at 113:11–19; Doc. No. 46-4, at 54:10–19, 56:7–8.) The euthanasia of the initial hogs to test positive was not conducted by inmates (Doc. No. 46-2, at 78:19–25), and the depopulation of the entire herd was done by Defendants and other TDCJ employees using a bolt gun and no inmates were involved. (Doc. No. 46-2, at 79:1–21; 88:2–18, 113:11–19; Doc. No. 46-4, at 54:10–19, 56:7–8.) Plaintiff Lashley's testimony further confirms that TDCJ employees were involved in the killing of infected hogs. (Doc. No. 52-3, at 41:4–16.)

There is no indication that Plaintiffs were actually involved in the extermination of infected hogs other than Plaintiff Narramore's and Plaintiff Thornton's testimony. Plaintiff Thornton testified generally that inmates were involved in the killing of infected hog with a pickaxe, but provides no further details. (Doc. No. 52-1, at 38:5–16.) Plaintiff Narramore testified that he was asked to kill, and did kill, infected hogs with a pickaxe causing him to be covered in blood. (Doc. No. 52-2, at 62:15–64:25.) Plaintiff Narramore, however, does not specify who asked him to kill the infected hogs and only states that when he put sows down with the bolt gun that he was

---

that protective equipment should be used, such a showing falls short of creating a genuine issue of deliberate indifference to workplace safety." *Id.* at 1100.

supervised by Defendants Goolsby, Harris, or Short. *Id.* at 62:15–24. Moreover, Plaintiff Narramore's testimony only establishes that officers were involved with the direction and supervision of hog killing with bolt guns, and that if he used a pickaxe, that that was a tool readily available to him. *Id.* at 64:20–25. At best it could be inferred from Plaintiff Narramore's testimony that one of Defendants Goolsby, Harris, or Short were present while he killed hogs with a pickaxe. The testimony does not establish that any of the Defendants asked him to kill infected hogs with a pickaxe, or that they supplied him with the pickaxe to kill the hogs. In fact, it establishes that if a pickaxe was used to kill a hog, it was a tool readily available to the inmates. Thus, even accepting Plaintiff Narramore's testimony as true, it fails to provide a factual basis that any named Defendant asked him to kill an infected hog in a manner that would have presented a serious risk of harm. Moreover, as discussed, the overwhelming evidence in the record establishes that inmates were not involved in the killing or transport of infected hogs.

As to the testing of the infected hogs, Defendant Goolsby, Defendant Beam, and Defendant Harris all testified that inmates were only asked to hold a snare while veterinarians conducted testing. (Doc. No. 52-8, at 58:12–25; Doc. No. 46-2, at 65:25 –66:6; Doc. No. 46-4, at 46:21–25.) Defendant Harris testified that inmates involved in holding the snare were wearing gloves and rubber boots. (Doc. No. 46-4, at 48:1–8.) Defendant Beam also testified that inmates involved in snare holding for testing were wearing rubber gloves, rubber boots, boot liners, and a mask. (Doc. No. 46-3, at 33:20–34:2.) Defendant Goolsby testified that inmates were provided with Tyvek suits for testing. (Doc. No. 46-2, at 66:7–22.) Again, there is nothing in the record to suggest that Defendants directed inmates to test hogs in a manner that presented a serious risk of harm. Rather, the testimony suggests that the involvement of inmates during the testing of hogs was limited to holding a snare and that PPE was provided. To the extent Plaintiffs are raising any additional

29

claims related to spread within the areas of confinement, training and/or cleanup instruction, or delay in medical care, those claims are not clearly asserted or established in the summary judgment record.

In sum, even if one or more of the Defendants knew the hogs were infected with Brucellosis or knew that better equipment or training should be provided to protect from the spread of disease, such knowledge is insufficient to create a genuine issue of material fact as to deliberate indifference on those claims because there is no evidence to suggest that Defendants actually drew the inference of a serious risk of harm or knowingly compelled Plaintiffs to perform labor that constituted a serious risk of harm. As discussed above, the undisputed facts show, at best, that Defendants were negligent. Plaintiffs' claims suggest merely that Defendants had a duty to cease operations at the hog barn or to provide better PPE and that Defendants breached that duty by failing to do so despite their knowledge of Brucellosis infection. As such, Plaintiffs have failed to raise a genuine issue of material fact regarding Defendants' deliberate indifference. Accordingly, Defendants are entitled to qualified immunity and summary judgment is appropriate.

### 1.  Clearly Established Right

Even if Plaintiffs could successfully show that Defendants violated the Eighth Amendment, Defendants are further entitled to qualified immunity because Plaintiffs have failed to show a clearly established right that would have put Defendants on notice regarding their conduct. The existence of "clearly established" law is a question for the court. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). The focus of the inquiry is whether the officer "had fair notice that her conduct was unlawful." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Although the doctrine "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question

beyond debate." *Id.* at 1152 (internal quotation marks omitted) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). The "salient question" is whether the state of the law at the time of defendants' conduct gave them fair warning that plaintiff's alleged treatment was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

"[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers...." *White*, 137 S. Ct. at 552 (internal quotation marks omitted) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. However, courts must not "define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152. The Supreme Court has described qualified immunity as protecting "all but the plainly incompetent or those who knowingly violate the law." *Id.*

Here, Plaintiffs rebut qualified immunity on the grounds that there was a clearly established right to be free from exposure to a serious communicable disease. (Doc. No. 52, at 36.) In support, Plaintiffs cite to *Farmer*, *Helling*, and *Jones*. *Id.* (citing 511 U.S. 825; 509 U.S. 25; and 971 F.Supp. 2d 648). These citations appear to be relied upon for the purpose of establishing the knowledge that prison officials may be held liable under the Eighth Amendment if they know inmates face substantial risk of serious harm. For example, *Farmer* involved a transsexual inmate who was placed in a unit with members of the same biological sex and was therefore vulnerable to sexual attacks by other inmates. *Farmer*, 511 U.S. at 831. Being factually distinguishable from the case at hand, the Court in *Farmer* merely established the test for deliberate indifference, holding that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The case holding establishing the standard for deliberate indifference is far too general to put Defendants on notice regarding their conduct in this case. *See Kisela*, 138 S. Ct. at 1152.

In *Helling*, the Court held that an inmate had stated a cause of action under the Eighth Amendment by alleging that he was exposed to levels of environmental tobacco smoke ("ETS") that posed an unreasonable risk of serious damage to his future health. *Helling v. McKinney*, 509 U.S. 25, 35 (1993). Again, this case is factually distinguishable. Although they do not elaborate, it appears that Plaintiffs are relying on *Helling* for its general holding that exposure to a serious communicable disease while under conditions of confinement can be actionable under the Eighth Amendment. However, the Supreme Court in *Helling* did not establish such a claim, but merely explained that the inmate had adequately pleaded a claim for potential exposure that could be viable under the Eighth Amendment if proved. *Id.* at 25. Thus, *Helling* is insufficient to put Defendants on notice of a clearly established right. *Jones* similarly turned procedurally on the court's finding that it would be improper to dismiss plaintiff's pleaded Eighth Amendment claim related to tuberculosis exposure without first allowing him an opportunity to conduct merits-based discovery. *Jones v. Tyson Foods, Inc.*, 971 F. Supp. 2d 648, 664 (N.D. Miss. 2013). Here, Plaintiffs have had a full and fair opportunity to conduct discovery, which the court has discussed herein on the summary judgment record before it.

Moreover, although Plaintiffs do not cite it in their briefed section on clearly established law, Plaintiffs, early in their briefing, cite to *Johnson* stating that the Fifth Circuit has addressed the issue of an inmate's substantial risk of contracting communicable disease. (Doc. No. 52, at 28, citing *Johnson v. Epps*, 479 F. App'x 583 (5th Cir. 2012)). In *Johnson*, the complaint alleged that prison officials forced inmates to work as unlicensed barbers and that the barbers routinely used

clippers and razors without sanitizing them after each use such that inmates who had diseases like HIV and hepatitis were cut or nicked by the clippers and razors, which contaminated the instruments with blood, and the contaminated clippers and razors then were used on uninfected inmates. *Id.* at 586. Again, the court's decision turned only on the sufficiency of the pleadings and the court found that the allegations in the complaint raised a reasonable inference that defendant had acted with deliberate indifference by implementing a policy under which inmates use unsterilized instruments on other inmates. *Id.* at 590. In this case, Plaintiffs have had a full opportunity to develop the record and the record fails to establish a material factual dispute with respect to deliberate indifference. Moreover, unlike *Johnson*, Plaintiffs have not pointed to any prison policy regarding work in the hog barn that presented a substantial risk to inmates.

As Plaintiffs have not provided controlling precedent that "squarely governs the specific facts at issue," they have failed to show that the law clearly established that Defendants' particular conduct was unlawful at the time. *See Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019). Therefore, Plaintiffs cannot overcome Defendants' qualified immunity defense and summary judgment is appropriate.

## CONCLUSION

For the reasons stated herein, the court **RECOMMENDS** that Defendants' motion for summary judgment (Doc. No. 45) be **GRANTED** on the grounds of qualified immunity and that Plaintiffs' Eighth Amendment claims against Defendants be dismissed with prejudice.

Within fourteen (14) days after receipt of the Magistrate Judge's report and recommendation, any party may serve and file written objections to the findings and recommendations contained in the report and recommendation. A party's failure to file written objections to the findings, conclusions and recommendations contained in this report and

recommendation within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).


   **So ORDERED and SIGNED this 19th day of October, 2022.**

                                          JOHN D. LOVE
                                          UNITED STATES MAGISTRATE JUDGE